**NATIONAL STEEL CORPORATION, GREAT LAKES STEEL DIVISION, Petitioner,**

v.

**Anne B. GORSUCH, Administrator, U.S. Environmental Protection Agency, Respondent.**

No. 81–3406.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 3, 1982.

Decided Feb. 14, 1983.

Rehearing and Rehearing En Banc Denied April 7, 1983.

**316**

Peter G. Veeder, Chester R. Babst, III, Louise W. Yoder, Thorp, Reed & Armstrong, Pittsburgh, Pa., for petitioner.

Anne B. Gorsuch, Adm'r, U.S.E.P.A., Eric B. Smith/William Pedersen, Pollution Control Div., Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., Margaret A. Corrigan, Asst. Regional Counsel, U.S.E.P.A. Region V, Chicago, Ill., for respondent.

Before ENGEL and JONES, Circuit Judges, and VAN PELT, Senior District Judge.[*]

NATHANIEL R. JONES, Circuit Judge.

The Environmental Protection Agency (EPA), in a final agency action pursuant to the Clean Air Act, as amended, 42 U.S.C. § 7401, *et seq.*, has approved, conditionally approved, and disapproved various provisions of the State Implementation Plan adopted by the State of Michigan in an effort to comport with nationally-required air quality standards. Petitioner National Steel Corporation, Great Lakes Steel Division, is seeking review of that action. For the reasons detailed below, we find that the EPA administrator neither overstepped the bounds of her authority nor made decisions which were "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1970). Accordingly, we affirm the EPA final action.

I

A combined state and federal program to control air pollution was formulated in 1970 through various amendments to the Clean Air Act, 42 U.S.C. § 7401, *et seq.* (the Act). Pursuant to the mandates of §§ 108 and 109 of the Act, the EPA promulgated national ambient air quality standards (NAAQS) for a variety of pollutants. The standards relevant to the case before us are those governing total suspended particulates in the air.[1] The limitations on particulate matter were set at levels deemed necessary to protect the public health and welfare.

The states were given the primary responsibility for achieving these air quality levels and, absent special circumstances, were required to do so by 1975. In keeping with this responsibility, the states were required, under § 110 of the Act to develop state implementation plans (SIPs) providing for the attainment and maintenance of the federal standards. The administrator was required to approve any state plan satisfying the criteria detailed in § 110(a)(2)(A)–(H).[2] *See Union Electric Co. v. EPA,* 427 U.S. 246, 250, 96 S.Ct. 2518, 2522, 49 L.Ed.2d 474 (1975). If, however, a state either

---

[*] The Honorable Robert Van Pelt, United States District Court for the District of Nebraska, sitting by designation.

1. The EPA defines particulate matter as follows: "Particulate matter consists of a broad range of chemically and physically diverse substances that exist as discrete particles in the air." (Resp. Br. at p. 3.)

2. §§ 110(a)(2)(A)–(H) provide:
The Administrator shall, within four months after the date required for submission of a plan under paragraph (1), approve or disapprove such plan or each portion thereof. The Administrator shall approve such plan, or any portion thereof, if he determines that it was adopted after reasonable notice and hearing and that—
(A) except as may be provided in subparagraph (I)(i) in the case of a plan implementing a national primary ambient air quality standard it provides for the attainment of such primary standard as expeditiously as practicable but (subject to subsection (e) of this section) in no case later than three years from the date of approval of such plan (or any revision thereof to take account of a revised primary standard); and (ii) in the case of a plan implementing a national secondary ambient air quality standard, it specifies a reasonable time at which such secondary standard will be attained;

failed to submit a plan, submitted an inadequate one, or failed to revise its plan when required to do so, the administrator was to promulgate a federal plan aimed at achieving the appropriate air quality in that state. 42 U.S.C. § 7410(c).

As of 1975, portions of many states had failed to achieve the national standards, despite the existence of previously approved SIPs. The Act was amended in 1977 in order to deal with these "nonattainment areas". Under the amendment (now Part D of Title I of the Act), states are required to submit revisions to their SIPS demonstrating that the NAAQS will be attained "as expeditiously as practicable," though no later than the end of the 1982 calendar year.

These Part D plans must meet the requirements of § 172(b) of the Act. In pertinent part, § 172 provides that the SIP shall, *inter alia:*

(2) provide for the implementation of all reasonably available control measures as expeditiously as practicable;

(3) require, in the interim, reasonable further progress (as defined in Section 171(11)) including such reduction in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology (RACT).

42 U.S.C. § 7502(b).

In an effort to, at minimum, prevent the exacerbation of existing nonattainment

(B) it includes emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of such primary or secondary standard, including, but not limited to, transportation controls, air quality maintenance plans, and preconstruction review of direct sources of air pollution as provided in subparagraph (D);

(C) it includes provision for establishment and operation of appropriate devices, methods, systems, and procedures necessary to (i) monitor, compile, and analyze data on ambient air quality and (ii) upon request, make such data available to the Administrator;

(D) it includes a program to provide for the enforcement of emission limitations and regulation of the modification, construction, and operation of any stationary source, including a permit program as required in parts C and D of this subchapter and a permit or equivalent program for any major emitting facility, within such region as necessary to assure (i) that national ambient air quality standards are achieved and maintained, and (ii) a procedure, meeting the requirements of paragraph (4), for review (prior to construction or modification) of the location of new sources to which standards of performance will apply;

(E) it contains adequate provisions (i) prohibiting any stationary source within the State from emitting any air pollutant in amounts which will (I) prevent attainment or maintenance by any other State of any such national primary or secondary ambient air quality standard, or (II) interfere with measures required to be included in the applicable implementation plan for any other State under part C of this subchapter to prevent significant deterioration of air quality or to protect visibility, and (ii) insuring compliance

with the requirements of section 7426 of this title, relating to interstate pollution abatement;

(F) it provides (i) necessary assurances that the State will have adequate personnel, funding, and authority to carry out such implementation plan; (ii) requirements for installation of equipment by owners or operators of stationary sources to monitor emissions from such sources; (iii) for periodic reports on the nature and amounts of such emissions; (iv) that such reports shall be correlated by the State agency with any emission limitations or standards established pursuant to this chapter, which reports shall be available at reasonable times for public inspection; (v) for authority comparable to that in section 760 of this title, and adequate contingency plans to implement such authority; and (vi) requirements that the State comply with the requirements respecting State boards under section 7428 of this title;

(G) it provides, to the extent necessary and practicable, for periodic inspection and testing of motor vehicles to enforce compliance with applicable emission standards;

(H) it provides for revision, after public hearings, of such plan (i) from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of achieving such primary or secondary standard; or (ii) except as provided in paragraph (3)(C), whenever the Administrator finds on the basis of information available to him that the plan is substantially inadequate to achieve the national ambient air quality primary or secondary standards which it implements or to otherwise comply with any additional requirements established under the Clean Air Act Amendments of 1977.

problems, Congress required all SIPs to provide for a moratorium on the construction of new sources of pollutants, or on the modification of existing ones, unless the state had an approved Part D plan by July 1, 1979. Michigan did not have an approved plan by the deadline and the EPA imposed the required moratorium.

In determining the requirements for an acceptable Part D plan, the EPA addressed a number of practical concerns. Most relevant to this case was the stance the EPA took with regard to fugitive emissions—i.e., matter having a negative impact on air quality which does not originate from a stack or vent, including, but not limited to, dust from ore storage piles, road dust and dust from nonindustrial urban sources. Since these emissions could easily play a significant role in nonattainment, and are so difficult to measure or control, it was clear that attainment would be difficult to demonstrate. The EPA recognized the possibility that a state might require RACT and still be unable to demonstrate attainment because of these immeasurables.

To avoid this problem, the EPA established alternative criteria for determining whether a state's plan was acceptable. First, the EPA decided to approve state plans where the state mandated RACT on all major stationary sources, met the other requirements of § 172,[3] and agreed to sub-

3. Section 172(b), 42 U.S.C. § 7502(b) requires in total:

(b) The plan provisions required by subsection (a) of this section shall—

(1) be adopted by the State (or promulgated by the Administrator under Section 7410(c) of this title) after reasonable notice and public hearing;

(2) provide for the implementation of all reasonably available control measures as expeditiously as practicable;

(3) require, in the interim, reasonable further progress (as defined in section 7501(1) of this title) including such reduction in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology;

(4) include a comprehensive, accurate, current inventory of actual emissions from all sources (as provided by rule of the Administrator) of each such pollutant for each such area which is revised and resubmitted as frequently as may be necessary to assure that the requirements of paragraph (3) are met and to assess the need for additional reductions to assure attainment of each standard by the date required under subsection (a) of this section;

(5) expressly identify and quantify the emissions, if any, of any such pollutant which will be allowed to result from the construction and operation of major new or modified stationary sources for each such area;

(6) require permits for the construction and operation of new or modified major stationary sources in accordance with section 7503 of this title (relating to permit requirements);

(7) identify and commit the financial and manpower resources necessary to carry out the plan provisions required by this subsection;

(8) contain emission limitations, schedules of compliance and such other measures as may be necessary to meet the requirements of this section;

(9) evidence public, local government, and State legislative involvement and consultation in accordance with section 7504 of this title (relating to planning procedures) and include (A) an identification and analysis of the air quality, health, welfare, economic, energy, and social effects of the plan provisions required by this subsection and of the alternatives considered by the State, and (B) a summary of the public comment on such analysis;

(10) include written evidence that the State, the general purpose local government or governments or a regional agency designated by general purpose local governments for such purpose, have adopted by statute, regulation, ordinance, or other legally enforceable document, the necessary requirements and schedules and timetables for compliance, and are committed to implement and enforce the appropriate elements of the plan;

(11) in the case of plans which make a demonstration pursuant to paragraph (2) of subsection (a) of this section—

(A) establish a program which requires prior to issuance of any permit for construction or modification of a major emitting facility, an analysis of alternative sites, sizes, production processes, and environmental control techniques for such proposed source which demonstrates that benefits of the proposed source significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification;

(B) establish a specific schedule for implementation of a vehicle emission control inspection and maintenance program; and

(C) identify other measures necessary to provide for attainment of the applicable national ambient air quality standard not later than December 31, 1987.

mit a schedule of measures to control fugitive sources of matter. Alternatively, the EPA decided to approve state plans which could demonstrate attainment "as expeditiously as practicable" *without* requiring RACT.

In order to assess whether a particular Part D SIP revision reflected RACT, EPA amassed data indicating levels of performance achieved by application of control technology at particulate sources. A particularly large amount of data was compiled with regard to iron and steel sources. On September 8, 1980, the EPA announced that it had compiled a "guidance" document summarizing that data. The EPA indicated that it would combine this data with that presented by the state and then approve, disapprove or conditionally approve [4] all elements of the SIPs submitted.

Applying this statutory and regulatory scheme, the EPA approved Michigan's original SIP in 1972. In 1978, however, the administrator designated certain areas of Michigan, including Detroit, "nonattain-

ment areas" for particulate matter and various chemicals. On April 25, 1979, Michigan submitted its required Part D revisions for these areas.

On May 22, 1981, the EPA published a notice of final rulemaking with regard to Michigan's Part D revisions for those nonattainment areas containing iron and steel sources. The *overall* strategy for emission and particulate matter control in these source areas was conditionally approved upon the state's commitment to adopt regulations which the EPA felt reflected RACT. The specific provisions of the SIP were approved, conditionally approved and/or disapproved as follows:

(1) EPA disapproved the state emission limitations for blast furnaces,[5] heating and reheating furnaces,[6] and sintering plants [7] because data contained in EPA's RACT materials indicated that more stringent limitations would be achievable. (2) EPA conditionally approved the rule for pushing emissions from slot-type coke ovens.[8]

4. Under the EPA conditional approval policy, the EPA will approve Part D plans which it finds to be in substantial compliance with the Act's requirements, provided the state agrees to expeditiously rectify the deficiencies which are preventing full compliance. The approval is given, then, upon the state's commitment to, and the Administrator's understanding that, the corrections will be timely made. If made, the SIP approval becomes final or unconditional, if not, conditional approval will be withdrawn.

5. A blast furnace is a massive verticle shaft in which extremely high temperatures are created to recover almost pure iron from iron-bearing materials. Ore, pellets, sinter, coke, limestone and other fluxes, added at the top, are blasted with hot air from near the bottom of the shaft. The blast ignites the materials, producing heat and carbon monoxide. As the molten ore is released, it sinks to the bottom of the furnace and is tapped into a pool called the iron trough through a hole drilled into the furnace called the tap hole. The cast house is the enclosing building. Molten slag, containing the fluxes and unwanted residues from the pellets and sinter, floats on the iron and is either skimmed off or tapped separately. Waste gases and vapors rise to the top of the shaft where they are emitted into the atmosphere through the roof of the cast house (known as the roof monitor). (Resp.Br. at p. 28.)

6. Heating furnaces, which may be divided into two general classes, soaking pit furnaces and reheating furnaces, are used to raise the temperature of the molten steel in the course of processing it until it is sufficiently and uniformly hot to be plastic enough for reduction by rolling or forging into the desired shape and size. (Resp.Br. at p. 32.)

7. Sintering is the process of converting various iron-bearing materials, including naturally fine ores, ore fines from screening operations, blast furnace flue dust, ore concentrates, mill scale and other iron-bearing materials of extremely small particle size, into a granular, relatively coarse form that is well suited for use in the blast furnace. The iron-bearing materials are mixed with lime flux, coke breeze or coal, and water to obtain the desired composition on mixing beds or belts, then ignited to agglomerate the fine metal particles. The sinter cake is then crushed, screened, and cooled to produce a sized, cooled sinter product for the blast furnace. (Resp.Br. at p. 26.)

8. Coke is the almost pure carbon residue that remains when most of the volatile matter in coal is removed by destructive thermal distillation. This distillation process is performed in coke ovens, typically of the slot-type (the ovens are long and narrow), which are designed and operated to permit separation and recovery of

(3) EPA conditionally approved the rule for standpipe assembly emissions during the coke cycle from slot-type coke ovens.[9]

(4) EPA conditionally approved the emission limitations for coke oven quench towers.[10]

(5) EPA conditionally approved the emission limitation for scarfing.[11]

It is this final rulemaking with regard to iron and steel sources which Great Lakes Steel contests.

## II

This Court's standard of review with regard to EPA action concerning a SIP is an extremely narrow one. The standards set out in the Administrative Procedure Act (APA), 5 U.S.C. § 706, are controlling. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971); *South Terminal Corp. v. Environmental Protection Agency,* 504 F.2d 646, 655 (1st Cir.1974). Those APA guidelines require us to determine whether the EPA followed the proper lawful procedures and acted within its statutory authority when it promulgated its final rulemaking and whether that rulemaking is constitutional. If so, we may set aside the EPA actions only if we find that the actual choices made were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In *Northern Ohio Lung Association v. EPA,* 572 F.2d 1143 (6th Cir.1978), we described how these latter determinations are to be made:

Scrutiny of the facts does not end, however, with the determination that the [administrative officer] has acted within the scope of his statutory authority. Section 706(2)(A) [of the Administrative Procedure Act] requires a finding that the actual choice made was not "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) [1970]. *To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . .*

. . . although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The

the by-products generated by the coking process. A typical coke oven battery has about 58 ovens, each with a net capacity of 16 to 30 tons of coal. The ovens are separated by heating flues. After the coal is loaded into the ovens, the ports are closed and the temperature inside is maintained at about 2400 degrees F for 16 to 20 hours until the coal is transformed into coke and volatile gases. The coke ovens are heated by any of a variety of flue systems fueled by gas. Emissions of dust and oven gas are released when, at the end of a coking cycle, the coke is "pushed" from the ovens. Doors at both ends of the oven are removed and the coke cake is pushed out of the coke side of the oven by an electrically-powered ram extended from a pushing machine. The coke is then pushed through an enclosed hood into a special quench car which carries the coke to the quench tower. (Resp.Br. at p. 37.)

9. Coke ovens must be equipped with one or two offtakes to carry off volatile gases created during the coking process. These gases pass through ducts in the oven top and enter a standpipe or an assembly of standpipes which is, in turn, connected to a collecting main by a damper valve. The standpipes are equipped with a cap valve which, when open, vents the gases into the atmosphere. After the ovens are charged, the standpipe lids are closed to isolate the ovens from the atmosphere. Improperly sealed or distorted caps, cracks in the standpipe bodies, or, most commonly, cracks or broken seals at the bottom of the standpipes result in emissions of these gases and particulates. (Resp.Br. at p. 43.)

10. Coke plant quench towers range from short, rectangular structures to tall, round stacks and can be constructed of wood, brick or metal. The quench operation entails spraying a large quantity of water, e.g., 25,000 liters, onto the hot coke which has just been removed from the coke ovens for a period of 90–120 seconds. After the water cools the coke, it drains from the quench tower into settling basins, then is recycled back into the process. (Resp.Br. at p. 44.)

11. Scarfing is a process used to remove defects from steel slabs, billets and booms, (bars of iron or steel rolled from ingot) before they are rolled into semifinished products. A torch of gaseous fuel oxygen is applied to the surface of the steel which rapidly oxidizes, heats to 1600 degrees F and liquifies. Scarfing can be done on hot steel between stages of rolling and can also be done by hand on cold steel. (Resp.Br. at p. 47.)

court is not empowered to substitute its judgment for that of the agency. (Emphasis in original.)

*Id.* at 1148, (*quoting Buckeye Power, Inc. v. EPA,* 481 F.2d 162, 171 (6th Cir.1973)). *See also Cleveland Electric Illuminating Co. v. EPA,* 572 F.2d 1150 (6th Cir.1978).

The petitioner nowhere contends that the rulemaking at issue was unconstitutional. However, Great Lakes Steel does raise a series of objections claiming, at various points, that the EPA has overstepped its statutory authority and/or has acted arbitrarily in its specific determinations.

### III

The petitioner's first argument has several elements, all urging the conclusion that the EPA has overstepped its authority *and* acted arbitrarily in making its RACT determinations in this case.

### A

First, petitioner claims that, since fugitive dust significantly contributes to nonattainment, the EPA should not require stationary sources to install RACT before Michigan completes its own studies concerning the relationship between fugitive dust and nonattainment and the possible methods for controlling that particular pollutant. Great Lakes Steel contends that it is unreasonable to interpret the statute as requiring mandatory RACT absent proof that the imposition of the installation cost will in any way contribute to attainment.

The EPA interprets the Act to unambiguously require installation of RACT *at a minimum* on existing sources in the nonattainment areas. While the EPA does not deny that it has itself adopted an administrative exemption to this otherwise "mandatory" requirement, it views that exemption as being narrowly tailored to fit within, and further, the spirit and goals of the Act. On the contrary, the EPA feels that the exemption suggested by Great Lakes Steel, i.e., to wait and see what the state studies show before requiring RACT, would altogether vitiate the mandates of § 172, thereby *undercutting* the purposes of the Act.

An agency's interpretation of the statute it has been created to implement is to be given considerable deference. *U.S. v. City of Painesville,* 644 F.2d 1186, 1190–91 (6th Cir.1981); *ASARCO, Inc. v. EPA,* 578 F.2d 319, 325 (D.C.Cir.1978). That interpretation need not be the only one the agency could have permissibly adopted in order to be acceptable; it need only be reasonable:

When different interpretations of the statute are plausible, so long as the EPA's construction of the statute is reasonable, we may not substitute our own interpretation for the agency's, *Train v. NRDC, supra,* 421 U.S. [60] at 75 [95 S.Ct. 1470 at 1479, 43 L.Ed.2d 731]. "The construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381 [89 S.Ct. 1794, 1801, 23 L.Ed.2d 371] (1967); *accord, Beal v. Doe,* 432 U.S. 438 [97 S.Ct. 2366, 53 L.Ed.2d 464] (1977) . . . .

*Lead Industries Ass'n., Inc. v. EPA,* 647 F.2d 1130, 1147 (D.C.Cir.), *cert. denied,* 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980). As such, even if this Court were to view the petitioner's interpretation as reasonable, the Administrator's construction of the statute must be upheld unless that view is plainly *unreasonable. Id. See also Train v. NRDC,* 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).

The point is well taken that an action which will *clearly* not further attainment should not be required. However, as noted previously, it is unclear to what extent each source of pollutants contributes to the nonattainment problem. All admit that the nature of the problem is too complex to allow for specific determinations of whether particular actions will or will not best further the attainment goal. It cannot be debated that RACT on existing stationary sources will ensure that *those* sources are not contributing to or exacerbating nonattainment. It does not appear unreasonable for Congress to have granted the EPA the

power to act with regard to known, identifiable sources of particulate matter, even though they remain unable to quantify the precise degree to which those sources are preventing the attainment of the NAAQS.

Section 172(b)(3) of the Act specifically states that a SIP "*shall . . . require*" RACT in the circumstances it defines. There is nothing in the statute which indicates that these terms are not to be given their plain meaning. In addition, we could find nothing in the legislative history of these provisions which in any way contradicts the mandatory character of the language employed. *See* S.Rep. No. 1196, 91st Cong., 2d Sess. 16 (1970), *reprinted* in *Legislative History of the Clean Air Amendments of 1970* (Comm. Print 1974). In light of the wording, history and rationale of the statute and the complex nature of the problem facing the EPA, it does not appear that a realistic application of the § 172 criteria could do anything less than require RACT for existing sources in nonattainment areas. At minimum, we clearly cannot say, as petitioner would have us, that EPA's interpretation of the Act is *plainly unreasonable.*

### B

Second, Great Lakes Steel asserts that the EPA has essentially created its own uniform set of RACT standards, bearing no relation to the nonattainment problem in Michigan. They claim that the imposition of the EPA's own standards has improperly usurped the statutory role of the state. This, petitioner argues, is both arbitrary and, by analogy, "ultra vires". EPA counters that it has *not* adopted "uniform" RACT standards and that the information it has compiled has not been "imposed" upon the states. Instead, EPA argues that

its data is merely a starting point for the states to develop RACT requirements and a guideline for EPA's general evaluation of a state's RACT proposals, *given* the economic and technical circumstances surrounding the particular sources being regulated.

■ The states are given wide discretion in formulating and revising their individual implementations plans. *See Ohio Environmental Council v. United States, etc.,* 593 F.2d 24, 29 (6th Cir.1979); *Northern Ohio Lung Association v. EPA,* 572 F.2d 1143 (6th Cir.1978). They have the primary responsibility for attaining and maintaining air quality. The role of the EPA in this scheme is purely a secondary one. *Train v. Natural Resources Defense Council,* 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). The issue then is whether the EPA's RACT determinations are consistent with that role. *Cf. Ohio Environmental Council v. United States, etc.,* 593 F.2d at 29.

■ There is no doubt that the EPA is empowered to evaluate proposed RACT standards to *some* extent. While the state does have the primary responsibility for establishing RACT guidelines, the EPA's statutory obligation before approving a SIP is to ensure that RACT is actually provided for. *See* § 110(a)(2)(I) of the Act in conjunction with § 172(b)(3).[12] The EPA claims that it only uses its RACT data as a guide in fulfilling this obligation. It cites a variety of EPA notices and regulations for the proposition that the EPA has not adopted inflexible standards. The EPA defines RACT as:

the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering tech-

---

12. Section 110(a)(2)(I) requires:

(I) [A SIP shall] provide[s] that after June 30, 1979, no major stationary source shall be constructed or modified in any nonattainment area (as defined in section 7501(2) of this title) to which such plan applies, if the emissions from such facility will cause or contribute to concentrations of any pollutant for which a national ambient air quality standard is exceeded in such area unless, as of the time of application for a permit for such

construction or modification, such plan meets the requirements of Part D of this subchapter (relating to nonattainment areas).

While § 172(b)(3) mandates:

(3) [Part D SIP revisions must] require in the interim, reasonable further progress (as defined in § 7501(1) of this title) including such reduction in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology.

nological and economic feasibility. Therefore, depending on *site-specific considerations,* such as geographic constraints, *RACT can differ* for similar sources.

45 Fed.Reg. 59331 (September 9, 1980) (emphasis added). The EPA claims that it will review and evaluate proposed standards on the basis of the *state analysis,* "taking into account all the available data as well as public comment on the state's analysis and the EPA's evaluation thereof." 45 Fed. Reg. 59199 (September 8, 1980).

This picture of flexibility is drawn into question, however, when one considers the practical application of these standards. While the EPA indicates that it only requires a state to make a threshold offering of information on which an evaluation can be based, it does seem to establish a presumption, albeit rebuttable, that its own data defines RACT. Consider EPA Statement at 45 Fed.Reg. 59331 (September 9, 1980):

> USEPA believes that the burden of demonstrating that a regulation represents RACT rests on the state. In reviewing a proposed SIP revision to determine its adequacy, USEPA can verify independently that the provisions in the state plan represent RACT. Although USEPA has not specified uniform RACT standards for the iron and steel industry, it has collected data which reflects the emission limitations achieved by various iron and steel sources applying control technology .... *Where a state proposed regulations which are not technically supported by US EPA's data, the state must submit adequate data supporting its proposal as representing RACT.*

The EPA is not required to accept a state's data without undertaking a critical evaluation of it. The accumulation of an alternative database would seem to be a necessary framework for such an evaluation. The formulation of a presumption *against* the acceptability of state standards appears troublesome, however. By placing such an additional burden on the states, the EPA seems to be removing some of the flexibility that Congress meant to afford the states in formulating their individual implementation plans. This may, indeed, be beyond the bounds of the discretion which the EPA is permitted to exercise in fulfilling its secondary role. We need not, however, nor do we choose to, resolve that issue in the case before us. In the circumstances presented, we consider the EPA's use of its own data for making its RACT determinations to be in keeping with its statutory role. Reason dictates that the EPA must have *some* basis from which to evaluate proposed SIPs; "approval" absent data to consider would be no more than rubber-stamping. The EPA can only be in a position to fulfill its statutory obligations if it has some degree of expertise, or some way of getting that expertise, regarding RACT in each relevant industry. In the instant case, Michigan did not supply detailed information in support of its RACT determinations. Where a state fails to supply the information necessary for a proper evaluation by the EPA, the EPA must be free to use its own acquired knowledge. In such circumstances, we readily find that the EPA has neither overstepped the bounds of its authority nor acted unreasonably.

## IV

The petitioner argues in the alternative that, assuming arguendo that the EPA may impose its own RACT standards on Michigan, the standards imposed were unreasonable. This argument has two branches. First, Great Lakes Steel claims that imposition of a RACT requirement on a given source *without* showing how that source contributes to nonattainment is unreasonable. Second, it contends that the technical standards set were unreasonable in light of the state of the iron and steel industry in Michigan.

[redacted] The first argument is essentially a reiteration of that raised with regard to the imposition of *any* RACT standard, and can be dealt with similarly. The fact that there is insufficient technical knowledge to determine the precise degree to which *each* source contributes to nonattainment does

not require that the EPA be prohibited from acting with regard to *all* sources. There is no doubt that iron and steel sources emit harmful particulate matter into the ambient air. Michigan could have avoided RACT requirements for these stationary sources by otherwise demonstrating attainment "as expeditiously as practicable." Michigan did not, or could not, do so with regard to these nonattainment areas. We find that it is wholly consistent with the scheme of the Act to place the burden on the state to show that RACT on its iron and steel sources is *not* necessary.

The second argument is aimed at the particular EPA-imposed limitations. Great Lakes Steel contends that it was unreasonable to disapprove the state emission limitations for blast furnaces, heating and reheating furnaces, and sinter plants and to insist on the conditions chosen for approval of the other iron and steel emission regulations.

The EPA disapproved the furnace and sinter plant limitations outright because its technical data indicated that more stringent air quality controls were achievable. Great Lakes Steel's objection to these rulings is essentially grounded upon claims of technological and economic infeasibility. Great Lakes Steel argues as follows: (1) the blast furnace standards are nonattainable because it is technologically infeasible to retrofit the necessary controls onto the existing cast houses; (2) the heating and reheating furnace limitations are unreasonable because the *de minimus* level of emissions from these sources does not justify the cost of further controls; and (3) the sinter plant standards are unreasonable because they would require the replacement of a newly-installed, costly control system.

The Supreme Court has held that neither the Administrator nor a reviewing court may reject a SIP on the ground that it is economically or technologically infeasible. *Union Electric Co. v. EPA,* 427 U.S. 246, 265, 96 S.Ct. 2518, 2529, 49 L.Ed.2d 474 (1976). This Court has expressed "genuine doubt" that a court of appeals *ever* has the power to consider infeasibility objections to an implementation plan, even where the plan is EPA-designed.[13] *Cleveland Electric Illuminating Company v. EPA,* 572 F.2d 1150, 1164 (6th Cir.1978). We are confident in concluding that it is at least inappropriate for the Administrator or this Court to approve state proposed limitations purely on the basis of such considerations. *See South Terminal Corporation, etc. v. EPA, etc.,* 504 F.2d 646, 656 (1st Cir.1974).

Congress set minimum standards for acceptable air quality. If a SIP or Part D revision fails to meet those standards it cannot be approved. Congress clearly recognized the possibility that these requirements may appear infeasible to those sources on whom they would be imposed.[14] That fact however, was not deemed a sufficient justification for failing to impose even the strictest of standards:

> In the Committee discussions, considerable concern was expressed regarding use of the concept of technical feasibility as the basis of ambient air standards. The Committee determined that 1) the health of people is more important than the question of whether the early achievement of ambient air quality standards protective of health is technically feasible; and 2) the growth of pollution load in many areas, even with application of available technology, would still be deleterious to public health. Therefore, the

---

**13.** The Court in *Cleveland Electric Illuminating Co. v. EPA* noted that the Supreme Court had specifically left this question open, citing *Union Electric Co. v. EPA,* 427 U.S. at 261 n. 7, 96 S.Ct. at 2527 n. 7.

**14.** The Supreme Court in *Union Electric* quoted the remarks of Senator Muskie, manager of the Senate Bill, reflecting this recognition:

> The first responsibility of Congress is not the making of technological or economic judg-

ments or even to be limited by what is or appears to be technologically or economically feasible. Our responsibility is to establish what the public interest requires to protect health of persons. This may mean that people and industries will be asked to do what seems to be impossible at the present time. *See also id.* at 32919 (remarks of Sen. Cooper); 33115 (remarks of Sen. Prouty).

Committee determined that existing sources of pollutants either should meet the standard of the law or be closed down. . . .

*Union Electric Co. v. EPA, supra,* 427 U.S. at 259, 96 S.Ct. at 2526 (*quoting* S.Rep. No. 91–1196, pp. 2–3 (1970)). The Supreme Court has recognized the "technology-forcing character" of the requirements of the Clean Air Act and, as such, has concluded that the Act was "expressly designed to force regulated sources to develop pollution control devices that might at the time appear to be economically or technologically infeasible." *Id.* at 257, 96 S.Ct. at 2525. *See also Train v. NRDC,* 421 U.S. at 91, 95 S.Ct. at 1487.

We agree with the First Circuit's statement in *South Terminal Corporation, etc. v. EPA,* 504 F.2d at 656, that:

... neither the EPA nor this Court has any right to decide that it is better to maintain pollutants at a level hazardous to health than to require the degree of public sacrifice needed to reduce them to tolerable limits.

Our prior decisions have reflected an awareness of both the high cost of attaining acceptable air quality standards *and* of the conscious decision of Congress to impose those costs. *See U.S. v. City of Painesville,*

644 F.2d at 1192; *Cleveland Electric Illuminating Co. v. EPA,* 572 F.2d at 1164. Accordingly, we find Great Lakes Steel's infeasibility arguments unpersuasive.[15]

The remainder of the petitioner's complaints are aimed at the EPA's conditional approval of the regulations designed to control emissions generated by coke oven pushing, standpipe assemblies, quenching towers and the scarfing process. Great Lakes Steel claims that the clarifications and/or changes, upon which approval of these state regulations were conditioned, are unreasonable.

As noted, we are required to affirm agency determinations unless we find that they are "arbitrary and capricious" and we can only make that determination where the EPA has failed to consider the relevant factors for determination or has made a clear error of judgment. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. at 416, 91 S.Ct. at 823. We find on the record before us that the EPA's particular conditions for approval represent reasonable methods for dealing with legitimate concerns regarding the effectiveness and enforceability of Michigan's iron and steel emissions regulations. As such, we find no basis for failing to affirm the choice of those conditions.[16]

**15.** Our holding would not differ *even if* we were to consider the appellant's argument regarding technological infeasibility. Great Lakes Steel does not contend that the technology does not exist which would enable the air quality limitations to be reached on its sinter plant or heating and reheating furnaces. While Great Lakes Steel does claim that the cast house standards are unattainable, this argument is without merit. Great Lakes Steel contends that retrofitting the necessary controls onto existing cast houses is infeasible. The data does not support this argument, however: Defasco and Bethlehem Steel have both retrofitted cast houses and have used canopy hoods to successfully capture most cast house emissions. The industry literature supports the EPA's conclusion that the technology is available to modify Great Lakes Steel's cast houses.

**16.** The petitioner also claims that the EPA's conditional approvals are not presently ripe for review. Great Lakes Steel argues that since these approvals are conditional by nature, requiring further action by the state, they necessarily cannot be "final" actions as required before review is appropriate. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

The Fifth Circuit is apparently the only one to have addressed this issue. In *City of Seabrook v. Costle,* 659 F.2d 1371 (5th Cir.1981), that Court applied the *Abbott Laboratories* finality criteria and held that conditional approvals of state Part D SIPs are final agency actions reviewable in courts of appeals under § 407(b)(1) of the Act:

[W]e believe that the "conditional approvals" were indeed "final action[s]" of the Administrator. As we have explained today in *City of Seabrook v. U.S. EPA* [659 F.2d 1349], "conditional approval" was a decision by the Administrator that the SIP revisions would meet the statutory requirements if certain specific conditions were met. The basis of granting "conditional approval" was the state's assurance and the Administrator's assumption that the condition would indeed be met. *See* 659 F.2d at 1358. The conditional

In sum, we find that the EPA's final rulemaking with regard to Michigan's Part D SIP revisions was wholly within the bounds of its statutory authority and was neither arbitrary and capricious, nor otherwise not in accordance with law. Accordingly, we affirm that rulemaking in all respects.

approval was "promulgated in a formal manner" and was a "definitive" statement of the agency's final position on the Texas SIP, not merely a "tentative" conclusion. *See Abbott Laboratories v. Gardner* [citation omitted].

659 F.2d at 1373. Petitioner's attempt to distinguish *City of Seabrook* is unconvincing. We believe that the reasoning of the Fifth Circuit is sound and find the rulings to be presently reviewable.