941 F.2d 1207
 33 ERC 1657
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
NATURAL RESOURCES DEFENSE COUNCIL, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Edwin B. Erickson, Regional
Administrator, United States Environmental
Protection Agency, Respondents.
 No. 90-2447.
 United States Court of Appeals, Fourth Circuit.
 Argued March 5, 1991.
Decided Aug. 19, 1991.
 
 On Petition for Review of a Final Action of the Environmental Protection Agency.
 David Daniel Doniger, Natural Resources Defense Council, Washington, D.C. (Argued), for petitioner; Kimi Matsumoto, Natural Resources Defense Council, Washington, D.C., James Simon, Natural Resources Defense Council, New York City, on brief.
 Richard B. Stewart, Assistant Attorney General, United States Department of Justice, Washington, D.C. (Argued), for respondents; George Van Cleve, Acting Assistant Attorney General, Environmental & Natural Resources Division, Karen L. Egbert, Environmental Defense Section, United States Department of Justice, E. Donald Elliott, General Counsel, Richard Ossias, Assistant General Counsel, Howard Hoffman, Office of General Counsel, United States Environmental Protection Agency, Washington, D.C., on brief.
 EPA
 PETITION DENIED.
 Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and W. EARL BRITT, United States District Judge for the Eastern District of North Carolina, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 The case is before us on a petition to review action of the Environmental Protection Agency (EPA) which was made final on May 16, 1990. The American Cyanamid Company maintains a facility in Havre de Grace, Maryland, a few miles north of Baltimore. It lies within the Baltimore air quality control region, which includes the City of Baltimore and five surrounding counties. The Baltimore region is designated a "nonattainment" area because ambient concentrations of ozone exceed the public health standard for ozone.
 
 
 2
 Reducing ozone concentrations requires controls on the broad spectrum of sources throughout the Baltimore area that release ozoneforming chemicals, known as "volatile organic chemicals" (VOCs).[1] The sources include large industrial facilities like those of American Cyanamid.[2]
 
 
 3
 The four American Cyanamid sources affected by the State Implementation Plan (SIP) revision in question here apply adhesives to fabric and paper. In that process, solvents in the adhesives are released into the air. The solvents are VOCs which contribute to the unhealthy levels of ozone in the Baltimore area.
 
 
 4
 In May 1977, EPA published a Control Techniques Guidelines (CTG) document covering VOC emissions from the coating of paper and fabric with adhesives, the operation carried on by what were described as the four American Cyanamid sources. EPA, "Guideline Series: Control of Volatile Organic Emissions from Existing Stationary Sources--Volume II: Surface Coating of Cans, Coils, Paper, Fabrics, Automobiles, and Light-Duty Trucks" (EPA-450/2-77-008, May 1977).
 
 
 5
 Considered as four separate sources, some, at least, of the American Cyanamid facilities failed to comply with permissible emission release levels. The Guidelines recommended that states establish regulations limiting emissions from each individual source (called a "coating line"). The document recommended a limit for each source allowing no more than 2.9 pounds of VOCs per gallon of coating applied to the paper or fabric.[3] However, a new view of the matter had led to EPA approval on May 16, 1990 of a revised State Implementation Plan (SIP) for American Cyanamid predicated on a grouping or "bubbling" approach.[4] An average of no more than 2.9 pounds per gallon for the four facilities would be deemed to be in compliance, the four being amalgamated into sub-sources of a single overarching source. NRDC, in a detailed petition for review, argues that the most recent EPA action, based on a bubbling approach, does not comply with the Guidelines.
 
 
 6
 The correctness of the May 16, 1990 revision is called into question by NRDC's petition for review. Although there "are no talismanic words that can avoid the process of judgment," Universal Camera Corp. v. NLRB, 340 U.S. 474, 489 (1951), two Supreme Court cases largely set out the parameters of judicial review of Agency action under Section 706 of the Administrative Procedure Act: Chevron, U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), and Motor Vehicle Manufacturers Assoc. v. State Farm Mutual Insurance Co., 463 U.S. 29 (1983). Chevron mandates that when a court has determined that the intent of Congress is ambiguous with respect to a specific issue, the court must be deferential to the "reasonable policy choice" of the agency. 467 U.S. at 843-45.
 
 
 7
 Slightly earlier, State Farm had held that an agency rule is nevertheless arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.
 
 463 U.S. at 43.[5]
 
 8
 EPA has used for substantial guidance a memorandum from Roger Strelow, at the time Assistant Administrator for Air and Waste Management, to Regional Administrators, "Guidance for Determining Acceptability of SIP Regulations in Non-attainment Areas" (Dec. 9, 1976), reprinted in BNA, Env. Reporter, Current Developments 1210 (1976) (hereinafter, Strelow memorandum). The definition of Reasonably Available Control Technology (RACT) set forth in the Strelow memorandum has been regularly repeated by EPA since then. The memorandum states:
 
 
 9
 The determination of RACT and the corresponding emission rate, ensuring proper application and operation of RACT, may vary from source to source due to source configuration, retrofit feasibility, operation procedures, raw materials, and other technical or economic characteristics of an individual source or group of sources....
 
 
 10
 Id. at 1210-11.
 
 
 11
 EPA has frequently repeated the Strelow definition of RACT. See, e.g., National Steel Corp. v. Gorsuch, 700 F.2d 314, 322-23 (6th Cir.1983) (quoting from 45 Fed.Reg. 59331 (1980)). NRDC points to two actions taken in 1990 contemporaneous with the revised SIP approval here under review. See 55 Fed.Reg. 26814 at 26832 (col. 3) and 26839 (col. 3) (June 29, 1990) (promulgation of RACT requirements for Illinois); 55 Fed.Reg. 39270 at 39271 n. 2 (col. 2) (Sept. 26, 1990) (disapproval of a source-specific revision to the Ohio SIP for ATEC Industries on the basis of failure to meet RACT).
 
 
 12
 NRDC seeks to emphasize that the Baltimore area, on a single source approach, did not, and continues not to, attain the ozone standard which was to be met by 1987. The American Cyanamid SIP revision was a relaxation, according to NRDC, in that it excused the company from complying, on a single source basis, with a prior emission limitation applicable to each of its four sources. The revised emission limitation allows some of American Cyanamid's sources, treated unitarily, to continue emitting ozone-forming pollution at a higher level than would have been allowed by the prior SIP. If Maryland or EPA had enforced the limit on a source-by-source approach, there would have resulted a reduction in ozone-forming pollution. Ozone pollution in the Baltimore area would have had to have been reduced.
 
 
 13
 NRDC's case depends on one basic premise, namely, that here involved are four distinct and individual sources operated by a single entity, American Cyanamid. But that leaves outstanding a very large if. Four ones are separate and distinct entities or integers. Yet, the number four, though equal to them, is but one single digit. The question becomes, therefore, whether EPA was operating within its administrative power when it changed from a unitary manner of dealing with American Cyanamid facilities to amalgamate what could be, and we may assume has been, treated as four separate sources into a single one.
 
 
 14
 It is significant that, in Strelow's memorandum, the language appears: "In determining RACT for an individual source or group of sources[6] the control agency[,] should select the best available controls."[7] (Emphasis added.) Considering all the language, in statute, regulation, informative bulletins or guidelines, we are unable to conclude that EPA has been arbitrary or capricious or unreasonable in grouping the four American Cyanamid facilities to form what is, in effect, a single source.
 
 
 15
 The refusal of EPA to group in other cases involving other parties and other places,[8] with their own particularities is not proof of arbitrariness. These cases are highly fact specific. The EPA emissions trading policy (ETPS) is not altogether permissible, on one hand, or altogether impermissible, on the other. Its application here is not beyond the power of EPA just because a different bubble technique was not approved in Ohio. It has been argued that, by installing an incinerator system or changing to low-solvent adhesives, the facilities above the 2.9 pound level could each have been brought into or nearer to compliance. But that fact alone fails to take into account the economic considerations which the EPA is charged with taking into account in determining what constitutes the use of "reasonably available control technology" (RACT).
 
 
 16
 Under the 1977 amendments to the Clean Air Act, an ozone SIP must, among other things, provide for attainment by the statutory attainment date (1987, in the case of the Baltimore area). 42 U.S.C. § 7502(a)(2). To meet that requirement, Maryland should take an inventory of its pollution sources to determine the total amount of emissions that are causing the pollution problem, and then determine the total amount by which emissions must be abated to reduce pollution levels to the extent necessary to meet the national primary standards. See generally 42 U.S.C. § 7502(b)(4). The State then must impose, by state law, enforceable pollution control requirements, applicable to polluters within the State, to reduce emissions by the required amount. See generally 42 U.S.C. § 7410(a)(1).
 
 
 17
 To assure that the States addressed the task of pollution reduction prior to the attainment date, Congress required periodic emission reductions in the interim years. Specifically, a SIP for nonattainment area must provide for "reasonable further progress ... including such reduction in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology." 42 U.S.C. § 7502(b)(3). "Reasonable further progress" (RFP) is defined as "annual incremental reductions in emissions ... which are sufficient in the judgment of the Administrator, to provide for attainment of the applicable national ambient air quality standard...." 42 U.S.C. § 7501(1).
 
 
 18
 However, treatment of the problem as one of simple absolutes will not solve it. Is American Cyanamid, employing the RACT to reduce emissions, "causing the pollution problem?"
 
 
 19
 The argument has been made that neither the state of Maryland nor EPA even addressed the economic feasibility or lack thereof of every distinct, individual source, on the one hand, or the grouping into a consolidated source of some or all of them, specifically the American Cyanamid facilities, on the other. Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29 (1983), has been cited for the proposition that deference is not due where an agency fails even to address the relevant factors. Much has been made in the way of insistence that the EPA must act to approve or disapprove a SIP revision on the basis of current compliance with requirements of Section 110(a)(2) and Part D. The fact that the present tense for the verb "meets" has been employed is claimed to be extremely significant. Yet, such a grammarian's approach, giving "tense" too intense a meaning, overlooks more extensive meanings which may have been meant. After all, that something "has met" may frequently signify that it still "meets." On the facts of this case, EPA need not here adhere to a source-specific RACT determination in the course of reviewing this SIP revision, based on bubbling, and on that basis satisfying RACT's limit.
 
 
 20
 The attempt to decry American Cyanamid on the basis of its treatment being the first of its kind, on reflection is little more than a debating point. The first time is not ipso facto forbidden, especially bearing in mind that identity of circumstance has not been shown and, in all probability, does not exist.
 
 
 21
 Finally, NRDC has complained that no legal interpretation has been set out in the interim or final EPTS. From that, NRDC has attempted to conclude that, for American Cynamid measurement by EPA to carry out the bubble policy, each particular source (interpreted as each separate and distinct source) must comply with RACT. That, however, would mean, in effect, the demise of the bubble technique. That would eviscerate the averaging approach embodied in the bubble technique, i.e., the source grouping technique. That would fail to acknowledge EPA's special knowledge and expertise. What it has done in this case is not unreasonable, arbitrary or capricious. Accordingly, the petition for review is denied.
 
 
 22
 PETITION DENIED.
 
 
 
 [1]
 Ozone is formed by chemical reactions in the air between VOCs and other emissions known as nitrogen oxides (NOx). The reactions are accelerated by sunlight; hence the term "photochemical smog." VOCs are emitted from large and small industrial sources and from motor vehicles. NOx controls are also required to curb ozone, but they are not in issue in this case
 
 
 [2]
 In 1980, the American Cyanamid facility emitted 182.1 tons per year of VOCs into the air and was classified a "major stationary source." 49 Fed.Reg. at 45674 (col. 3)
 
 
 [3]
 It emphasized as limiting methods incineration and reformulating coatings to those containing lower proportions of organic solvents
 
 
 [4]
 55 Fed.Reg. 20269
 
 
 [5]
 Chevron upheld on a due deference or "permissible construction of the statute" basis a shift from an EPA purely individual source approach to a plan wide single bubble approach in the instances there involved
 
 
 [6]
 The same language appears in EPA's SIP preparation guidance
 
 
 [7]
 The use by Strelow of language relating to "the lowest emission limit that a particular source is capable of meeting" did not address whether grouping to create an amalgamated source would create "a particular source."
 
 
 [8]
 See, e.g., 50 Fed.Reg. 10,964 (March 19, 1985) (EPA disallowance of bubble for Senco Products in Ohio); 52 Fed.Reg. 42,019 (Nov. 2, 1987) (disapproving another proposed bubble submitted by Ohio EPA)